## Peter Glynn v. Mary Glynn.

### Gen. No. 13,647.

1. SEPARATE MAINTENANCE—*when right to relief not barred by laches.* Held, under the evidence in this case, that a delay of thirty-two years in seeking separate maintenance after the right thereto had accrued, did not constitute such laches as would bar the granting of the relief sought.

2. SEPARATE MAINTENANCE—*what does not bar right to relief.* The Statute of Limitations does not run against the liability of the husband to support his wife and therefore does not operate to bar the right to relief by separate maintenance.

3. SEPARATE MAINTENANCE—*how award of alimony determined.* The amount of the allowance to be awarded in an action for separate maintenance rests largely in the discretion of the chancellor and the allowance made by him will not be disturbed where the Appellate Court cannot say from the briefs that the limit of such discretion has been exceeded.

4. SEPARATE MAINTENANCE—*when allowance of solicitor's fees improper.* Judicial notice will not be taken of the value or extent of legal services rendered in cases where an allowance therefor is permitted by statute, and an allowance for solicitor's fees made in a separate maintenance proceeding which is not supported by any evidence in the record will be set aside on review.

Separate maintenance. Appeal from the Superior Court of Cook County; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed March 9, 1908.

EDMUND S. CUMMINGS, for appellant.

FREDERICK PEAKE and ROBERT I. GREGG, for appellee.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion of the court.

This is an appeal from a decree for separate maintenance, in which fifty dollars a month was allowed for support of appellee and two hundred dollars for her solicitor's fees.

It is assigned for error and argued that the decree is contrary to the weight of the evidence, in that it does not sustain the findings of the decree that plaintiff was living separate and apart from appellant at the time of the filing of the bill without her fault; also that appellee is guilty of such laches in waiting thirty-two years from the alleged desertion before instituting her action, as to bar her cause of action; that the allowance is unreasonable and excessive, and that there is no evidence in the record supporting the allowance for solicitor's fees.

The parties were married in January, 1866, and lived in the marital relation until June, 1874, when appellant deserted his family, at the time consisting of his wife and two children. During the eight years of their cohabitation six children were born to the Glynns, four of whom had passed from earth at the time of their separation. Since such desertion Glynn has failed to make any provision for the care or support of either his wife or children, except as hereinafter mentioned as to the children.

The bill charges that Glynn, during the time he lived with his wife, was cruel to her, struck her several times, knocking her down and blackening her eyes, and that he was also addicted to excessive indulgence in intoxicating liquors. It is further charged that appellee is without property or means of support save the equity in two lots in Denver, of value not to exceed $500, and for the past fourteen years has been supported by her married daughter; that she is over sixty-five years of age, decrepit, and unable to work and earn her livelihood.

Appellant admits the marriage and the birth of six children, but denies the desertion charged, or that appellee is living separate and apart from her without her fault, and while admitting that the parties separated in June, 1874, avers

that such separation was brought about by the desertion of appellee; that during the thirty-two years of desertion appellant never heard of appellee until the filing of the bill; denies that he possesses any property other than an interest in the estate of Catherine Healy, deceased, valued at about $3,000; avers that he is sixty-nine years old, has a lame leg, and is unable to earn more than a living for himself by reason of his advanced age and infirmities.

The evidence was contradictory, but developed that for several years before the separation the relations of the parties were strained, and that quarrels and disagreements over domestic matters were of frequent occurrence. However, the crucial question as to who was the deserter of the other rests in the solution of the conflicting stories of the parties. On the wife's part it appears that after a quarrel Glynn left his home and never returned, and on his part that he went to the Wesley Hospital, suffering from rheumatism, and upon his return to the home he left, found it deserted. After the long lapse of years between the separation of the parties and the trial, it may well be that the memories of the parties had become somewhat dimmed as to the events causing the parting of the ways between them, yet a woman would be more apt to have deeply engraven upon the tablets of her memory the incidents and events constituting the tragedy in her career, which set her adrift upon the world, to care, unaided by her husband, for herself and her children, than would the husband, who shifted all his matrimonial responsibilities and duties upon his wife. His refraining from attempting to have the marriage bond dissolved by an application to the courts for a divorce on the ground of desertion, may be reasonably inferable to his consciousness of the fact that he, and not his wife, was the guilty party in their separation. His contradictory statements in relation to his being in the hospital at all, and his failure during all these years to make any attempt to get his family together again, his callousness as to their condition, his failure to contribute to their support, and his studied attempt to conceal his property and prevent its being made liable to contribute to the support

of his wife, may,—as they undoubtedly did,—have caused the chancellor to give but little credence to his testimony.

We think the greater weight of the evidence establishes that appellant in June, 1874, wilfully and without just cause, deserted appellee and their children, and that appellee has ever since lived separate and apart from appellant without her fault. We do not doubt but that during most of the time since June, 1874, either party could have found the other with a little effort. Appellee removed to Denver, Colorado, three years after her desertion, where she had a sister living, and appellant has been in Chicago all the time. This is partly borne out by the admitted fact that appellant for about three years maintained his daughter Mary at the Washington Heights convent. She came from her mother at Denver to go to the convent, and at the time she quit the school and returned to Denver more than twelve years had passed since the father and mother had ceased to live together. The daughter Anna visited her father and was maintained by him for several months eight years before the bill was filed. Yet appellant during none of the time made any provision for his wife, or attempted to bring about a resumption of their marital relations.

That appellee has been lax in not asserting her rights until the lapse of thirty-two years, which, in some circumstances, might be sufficient to bar her from obtaining the relief sought, cannot be denied. However, her right to relief must rest in facts sufficiently convincing to overcome the laches thus clearly imputable to her. Appellant was not in any business during these thirty-two years which indicated that he was possessed of any means; repeated letters to him failed of response; a telegram telling him of the death of his daughter Mary remain unnoticed. Mrs. Glynn excuses herself from sooner asserting her right to a separate maintenance by saying, in her testimony, "I didn't know what he was doing, so I tried all I could to take care of myself and children. Mr. Glynn never put a dollar in property, and what was the use of trying to make him support me? He had the money in his pocket, and I couldn't get at it." When she

Glynn v. Glynn.

discovered he had property under the Healy will, which could be reached, she at once asserted her right to compel her husband to support her. In the meantime, while sick in body, appellee, when no longer able to work, was supported by her only surviving child, Anna Corsepius. Appellant told his daughter Anna that he had money, but did not want her mother to have any of it. On the witness stand he testified that he had been buying and selling horses on commission and on his own account, and "made money and lots of it," yet he refused to tell what he had done with his money. While he could not secrete or hide his interest in the Healy real estate, yet he was obstinate in testifying about the value of his interest in it and minimized its value as best he was able. He admits he had money in a safe deposit box, but claims that it was not his. Yet he fails to disclose the person to whom the money belonged. In his testimony he says he is not a "spender" or a "drinking man"; yet having made money, as he tells us he did, he fails to account for his lack of possession of any at the time of the hearing.

We think the facts recited sufficiently potent to exculpate appellee from laches. An earlier appeal to the courts would evidently have been barren of financial aid.

Appellant has escaped the performance of the duty cast upon him by the law and good morals for thirty-two years, and from his whole testimony, with the reasonable inferences to be drawn from it, the chancellor was justified in fixing the allowance at the amount which he did. If it is too high and disproportionate to the wealth of appellant, the fault is his own, chargeable to his secretiveness and lack of frankness as a witness, and his apparent evasion in failing to honestly disclose his financial condition.

The amount of such an allowance rests largely in the discretion of the chancellor, and as we cannot say from the proofs that the limit of such discretion has been exceeded, we do not feel authorized to disturb it. Johnson v. Johnson, 125 Ill., 510; Harris v. Harris, 109 Ill. App., 148; Porter v. Porter, 162 Ill., 398.

We think appellee has exculpated herself from the doctrine of laches as applied to her long continued failure to call upon the courts to compel her husband to support her. The effort would have been fruitless until the bequest under the Healy will became operative. Diligence, when diligence could be made effective, was exercised. When appellant could be proved to possess property, the action was immediately started to subject that property to her claim for support. The laches has been excused.

There is no Statute of Limitations which runs against the liability of the husband to support his wife. Desertion and neglect, however long continued, will not, in a proper case, relieve from the responsibility cast upon the husband by law to maintain and support his wife while the marital relation continues, and, as said in Carr v. Carr, 33 N. E. Rep., 805, "If the plaintiff has by some means eked out an existence in the past, she cannot compel the defendant to compensate her for the cost. * * * The effort here is to obtain nourishment and means of sustenance for the present and future." So in this case it is the present and future support that is provided for by the decree, and not compensation for the cost of support in the past. Directors of the Poor v. Mercer, 6 Pa. L. J. R., 75.

Appellee in her old age and infirmity, unable as she now is, further to support herself, is entitled to a separate maintenance from her husband, in accord with her necessities and his ability to provide. There is no proof in this record justifying the conclusion that appellee either sanctioned the desertion of appellant in the first instance, or has since acquiesced in it. She was as helpless to prevent the desertion as she has since been to bring about a reconciliation, and just as powerless to earlier compel him to pay support money. The authorities cited by counsel for appellant on this point have no application to the facts found in the record.

There is an entire lack of evidence to support the allowance of solicitor's fees. Under well-settled legal principles the decree as to such allowance cannot be sustained. The court cannot take judicial notice of either the value or extent

of legal services rendered in cases where an allowance therefor is permitted by the statute. We must look to the record for evidence to sustain it, and if none is found, the decree as to such allowance is erroneous.

In Metheny v. Bohn, 164 Ill., 495, the rule is announced that no allowance for solicitor's fees can be sustained where the record fails to disclose the service performed by the solicitor and the value thereof, and it must appear that the fee is a usual and customary fee in like cases. On this subject the court say, in Reynolds v. McMillan, 63 Ill., 46: "In fixing the amount of a reasonable fee the examination should be directed to what is customary for such legal services where contracts have been made with persons competent to contract, and not what is reasonable, just and proper for the solicitor in the particular case. The inquiry should be not what an attorney thinks is reasonable, but what is the usual charge."

The court say in Metheny v. Bohn, supra, concerning that which is essential for the consideration of a court of review on such allowances, "When the question is considered in an appellate court, although it is one about which the court is well qualified to form an opinion, and upon which it will exercise an independent judgment, the evidence is necessary to a proper review of the allowance, for the purpose of showing what the ordinary and usual charges of solicitors for like services are in the court where the allowance was made, in cases where such fees are the subject of contract between solicitor and client. The allowance in this case being without any support in the record, cannot, under the well established rule, be sustained."

In Hunter v. Hunter, 121 Ill. App., 380, an allowance of solicitor's fees in a separate maintenance cause was held erroneous for the sole reason that no evidence to support it was in the record. Goodwillie v. Millimann, 56 Ill., 523; Albright v. Smith, 68 ibid., 181; Spring v. Collector of Olney, 78 ibid., 101.

The latest expression on this subject by our Supreme Court is found in Reed v. New York Exchange Bank, 230

Ill., 50, where the court say: "The allowance of $100 damages as attorney's fees in this case is wholly unsupported. There is no evidence here whatever that appellees had paid or become liable to pay any attorney's fees in and about the dissolution of the injunction. If no damage has been sustained, none ought to be awarded, and this can only be determined from evidence."

The decree, in so far as it finds that appellee is living separate and apart from her husband without her fault, and allows for her future support $50 a month, is sustained by the proofs and is affirmed; but for the error indicated in the allowance of $200 for appellee's solicitor's fees, that part of it will be reversed and the cause remanded, for further proceedings conformable to this opinion.

*Decree affirmed in part and reversed and remanded in part.*

**Per Curiam.** Subsequent to the filing of the foregoing opinion, the appellant, by leave of court, withdrew the following assignment of error:

"9. The trial court erred in ordering and decreeing that the defendant pay to the complainant as and for the fees of her solicitors the sum of two hundred dollars within ten days from the entry of the decree."

Whereupon, the order and judgment of this court heretofore entered was vacated, and on motion of the appellee the decree of the Circuit Court is affirmed.

*Affirmed.*